## WRIGHT et al. v. THERMOID RUBBER CO.

Circuit Court of Appeals, Third Circuit.
Oct. 6, 1928.

Rehearing Denied November 6, 1928.

No. 3685.

Joseph G. Denny, Jr., of Philadelphia, Pa., for appellants.

Howson & Howson, of Philadelphia, Pa. (Charles H. Howson and Kennard N. Ware, both of Philadelphia., Pa., and Ellis L. Pierson, of Trenton, N. J., of counsel), for appellee.

Before BUFFINGTON, WOOLLEY, and DAVIS, Circuit Judges.

DAVIS, Circuit Judge. This is an appeal from a decree of the District Court dismissing plaintiffs' bill charging the defendant, Thermoid Rubber Company, with infringing the following United States patents: No. 1,576,138, issued March 9, 1926, on application of Arthur C. McBride, to William A. Wright and Chalon E. Corson; No. 1,576,- 135, issued March 9, 1926, on application of William A. Wright and Chalon E. Corson, to the Wright & Corson Company; and No. 1,493,521, issued May 13, 1924, to Corson and Wright.

The patents relate to drilling machines for drilling and countersinking linings for automobile brake bands. In the use of automobiles, brake band linings become worn, and the bands must from time to time be relined.

The machines in controversy are used in drilling and countersinking the rivet holes in the new linings preparatory to riveting the linings to the brake bands.

The plaintiffs are engaged in manufacturing and selling the machines in question, and the defendant is engaged in manufacturing rubber goods, including brake band linings, and in this business, it purchases and sells to its brake band lining customers the drilling and countersinking machines which are alleged to infringe the patents in suit.

In course of the trial, the plaintiffs conceded noninfringement of the patent No. 1,493,521, issued to Corson and Wright, and agreed to the dismissal of the bill as to that patent. At the conclusion of the trial, the learned District Judge held the claims in issue of the other two patents invalid for lack of patentable novelty, and the plaintiffs appealed to this court.

Claims 10, 11, 18, 19, and 20 of patent No. 1,576,138 are in issue and claims 6 and 10 of patent No. 1,576,135 are in issue.

Admittedly, if defendant infringes either patent, it infringes both, and so, if it does not infringe one, it does not infringe the other. A typical claim is No. 10 of patent No. 1,576,- 138. It reads as follows:

"A machine for drilling and countersinking a fabric brake lining in registration with apertures in a metal brake band which comprises an upwardly projecting tool having a drilling section and a countersinking section, means below the drilling section of said tool for rotating it, said drilling section being concealed by a lining and band positioned for drilling, means visibly indicating the position of said drilling section when concealed by a lining and band, said means being positioned to permit alignment therewith of a band aperture to effect registration of such aperture and the tool, and means for controlling the penetration of said tool into a lining on the band."

There are three elements in this claim: (1) An upwardly projecting tool combining a drill and countersinking device; (2) the centering pin (12c) adapted to be engaged by the holes in the brake band; and (3) the gauge for controlling the penetration of the countersink into the lining on the band. All the claims of both patents involve these same three elements.

In drilling a countersunk hole, an ordinary hole may first be drilled and then countersunk by a countersinking tool known as a countersink, or both may be done at the same time by a tool combining the drill and countersink. This tool combining both the drill

and countersink was well known at the time the patents in suit were applied for. Consequently the patents do not describe the tool. Both of them recognize it and refer to it as though every one knew of it. Mr. McBride, one of the patentees said that he, at the time the application was made was "familiar with commercial drills and countersinks combined in one tool." He testified that: "We used combined drills and countersinks for centering shaftings, and so forth." John Wilson Brown, Jr., an expert consulting engineer, testified that he had "been familiar with this tool for the last forty-five years and it was then no novelty. * * * It was used at one operation to drill and countersink a piece of work, used on wood and metal both. * * * It is used to produce holes to receive screws, flat-headed machine screws, flat-headed wood screws, centers for pieces to put on lathe centers, and in general to produce holes having more than one diameter." Mr. Carl E. Ogren, research engineer of the respondent company, testified that "to my own knowledge I used a combined drill and countersink as long as thirteen years ago. While I was still at Cornell University we had a considerable amount of machine shop work there, and in the course of that machine shop work we used a combined drill and countersink." He produced one of the type which he used in Cornell and also a catalogue showing a combined drill and countersink which he purchased in 1914 or 1915. He further testified that combined drills and countersinks had for some time been in ordinary use in both metal and wood work.

The testimony abundantly establishes that, when McBride applied for his patent, the combined drill and countersink was a tool in common use to countersink flat screw heads in both metal and wood work. The increase in the use of automobiles brought with it an increase in the business of relining brake bands. In consequence, there arose a need for machines for drilling holes in brake band linings. Many machines for doing this work were devised by various mechanics in different parts of the country and all of them working independently used the combined drill and countersink. It was used by Mc-Bride, Wright, and Corson, Cady, Gerry, Petry and Brandt, Grubb, Winn, and others. These machines differed somewhat, but the combined drill and countersink was used by all of them. The relining of brake bands constantly increased until about 1919 it began to be the work of a specialist as distinguished from that of the ordinary garageman.

The centering device is the second element claimed by the patentees. Various devices for centering the work in line with the drill were old and common. This is established by reference to the Gardner reissue patent No. 9,114 (1880), for "improvements in boring machines"; the Peck patent No. 956,537 (1898), for "improvements in machines for drilling eyeglass lenses"; the Ferries patent, No. 979,273 (1910), for "improvements in guides in drilling machines," in which a hole is drilled in the face of a lens to register with a hole in the opposite face. These are some of the prior art patents which use centering devices for identically the same purpose for which they are used in the plaintiffs' patents. While the details and design of the machines differ, the same principles are employed in all. So there was nothing new in the employment of this element by the patentees.

The third element claimed in the patents is the stop or gauge (11c) for regulating the depth of the penetration of the countersink into the lining of the brake band.

An adjustable stop for limiting the penetration of the drill into the work drilled, was a well-known feature of drilling machines generally long before the applications for the patents in suit were made. This is disclosed in the patents issued to Covel, No. 521,206 (1894), for "improvements in centering tools," and to Johnson, No. 592,912 (1897), for "improvements in centering drill chucks."

The patentees simply took old and well-known tools and used them in a new industry. There was nothing new in the tools or in the method of their combined use. We agree with Judge Duff, who, speaking for the Supreme Court of Canada, in construing the McBride patent, said:

"I have come to the conclusion also that McBride's action must fail on the second ground, namely, that there was no patentable invention. There is nothing new, either in McBride's devices or in the end he sought to attain, except that these devices were applied by him to a new material. Machines had been constructed for boring and countersinking in one operation, and devices were well known for guiding the operation so that the axis of the hole bored in the blind side of the material should correspond with the axis of the existing hole. Then the stop for limiting the depth of the countersink was a perfectly well known device; indeed, the uncontradicted evidence is to the effect that every commercial press operated by power contains that element."

The Exchequer Court of Canada affirmed the decree of the Supreme Court.

The decree of the District Court is affirmed.